<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2

 3       UNITED STATES OF AMERICA,           )
                                             )
 4                    Plaintiff              )
                                             )
 5             -VS-                          )   Criminal No. 18-10479-PBS
                                             )   Pages 1 - 22
 6       ALAIN LENORD,                       )
                                             )
 7                    Defendant              )

 8                            SENTENCING

 9

10             BEFORE THE HONORABLE PATTI B. SARIS
               UNITED STATES CHIEF DISTRICT JUDGE
11

12
       A P P E A R A N C E S:
13
            PHILIP A. MALLARD, ESQ., Assistant United States Attorney,
14     Office of the United States Attorney, 1 Courthouse Way,
       Room 9200, Boston, Massachusetts, 02210, for the Plaintiff.
15
            JESSICA P. THRALL, ESQ., Federal Public Defender Office,
16     51 Sleeper Street, 5th Floor, Boston, Massachusetts, 02110,
       for the Defendant.
17
       ALSO PRESENT:  Tricia Marcy, United States Probation Office.
18
                                    United States District Court
19                                  1 Courthouse Way, Courtroom 19
                                    Boston, Massachusetts  02210
20                                  July 18, 2019, 2:42 p.m.

21

22
                            LEE A. MARZILLI
23                       OFFICIAL COURT REPORTER
                        United States District Court
24                      1 Courthouse Way, Room 7200
                            Boston, MA  02210
25                          (617)345-6787
</pre>

<u>P R O C E E D I N G S</u>

1

2     THE CLERK:  Court calls criminal 18-10479, United

3  States v. Lenord.  Could counsel and Probation please identify

4  themselves.

5     MR. MALLARD:  So good afternoon, your Honor.  Philip

6  Mallard for the United States.

7     THE COURT:  Thank you.

8     MS. THRALL:  Good afternoon, your Honor.  Jessica

9  Thrall for Alain Lenord.

10     MS. MARCY:  Good afternoon.  Tricia Marcy for

11  Probation.

12     THE COURT:  Thank you very much.  You may be seated.

13     I've got a couple letters, briefs.  And let me just

14  say, I do understand that this is a binding plea agreement,

15  which, just to alleviate everybody's suspense, I will accept.

16     Do you still want me to accept the guilty plea?

17     MS. THRALL:  Yes.

18     THE COURT:  All right, so I enter now the plea of

19  guilty.  I find it's competent and supported by an independent

20  basis in fact, and I accept it.

21     I say that and I say the following, which is, I always

22  respect the Probation Department's view on the Guidelines.

23  There's one in particular -- well, two of them actually raise

24  some close questions.  So I'm going to calculate the Guidelines

25  consistent with the plea agreement, but I do acknowledge that

1     there is a substantial question based on that case about if you

2     have an obliterated number on one side but not on the other.

3     The First Circuit didn't resolve that question.  It's a gray

4     area.  And I am just simply saying, because it wasn't

5     completely obliterated, the purpose of the Guideline I think

6     was to give you that level bump-up because you were hiding who

7     you had it; but if it was plain and clear on part of it, is

8     that the case from the government's view?

9             MR. MALLARD:  Essentially, your Honor --

10            THE COURT:  On the frame there was a --

11            MR. MALLARD:  The frame and the slide were intact, and

12    it was the interchangeable barrel that was obliterated.

13            THE COURT:  That's right.  And so I understand where

14    the Probation Department came down on that, and it's an open

15    legal question in our circuit, and I will accept the plea that

16    resolves that.

17            The second thing is, was it done in furtherance of a

18    drug trafficking?  I suppose it's a plausible claim, but if the

19    government chooses not to put on evidence on that, I don't feel

20    like I have a record to go with it.  So I do thank Probation,

21    as always, in really giving an honest look at it because we

22    don't appreciate it when facts or law is bargained away; but

23    here I think they were both gray areas, and I understand the

24    basis for the plea.  So if I'm wrong for some reason on the

25    Guidelines, I would vary to this point anyway.

1          So that puts us at a total offense level of 17,

2     Criminal History Category of III, a 30- to 37-month range of

3     incarceration, supervised release of three years, and a fine

4     range of $20,000 to $200,000.  I forget -- oh, I probably have

5     to go down, right?

6          MS. MARCY:  Yes.  The fine range, based on your

7     findings, is now $10,000 to $95,000.

8          THE COURT:  Okay, I forgot to adjust that.  Thank you.

9          MS. MARCY:  And a special assessment of $100.

10         THE COURT:  Okay.  So no count of conviction carries a

11     mandatory minimum sentence, and I decline at this point, based

12     on the full record, to downwardly depart from the Criminal

13     History Category III.  That's not so relevant anymore.  But, in

14     any event, what is the argument for the government on this?

15         MR. MALLARD:  Your Honor, the government is

16     recommending the Court impose the 37 months that's set forth in

17     the plea agreement.  With the Court's calculation of the PSR,

18     it certainly falls within the Guidelines; but with respect to

19     the factors under 3553, the government's position is that this

20     sentence more than adequately -- it's the least severe sentence

21     that can be imposed to satisfy the requirements under the

22     statute.  In particular, I'd note that the criminal history of

23     the defendant is largely driven by that prior Brockton drug

24     case, which not only increased the offense level but also, upon

25     his revocation for that, ends up being a two-point increase for

1   the criminal history.  And then he was also on probation, so

2   there's sort of a three-part increase to this defendant's

3   criminal history resulting from one prior case, which was a

4   significant case involving stolen property and a decent amount

5   of fentanyl as well which was over trafficking weight.  That

6   being said, coupling that prior case with the case under

7   indictment and then the incident that we're now before the

8   Court with, it's a significant criminal history that's

9   reflected in the 37 months.  And obviously it's a significant

10  sentence for this defendant who has not --

11          THE COURT:  I had a question.  There's a pending state

12  case, right?

13          MR. MALLARD:  That's correct.

14          THE COURT:  And what is the status of that?

15          MR. MALLARD:  I believe it's on for a motion hearing

16  in January.

17          THE COURT:  Next January?

18          MR. MALLARD:  In Norfolk Superior Court, your Honor,

19  yes.

20          THE COURT:  What is that about?

21          MR. MALLARD:  I believe there's going to be some

22  suppression of -- well, I know some discovery motions are

23  pending regarding --

24          THE COURT:  No, no, no, I meant more the nature of the

25  charges.

1          MR. MALLARD:  The nature of the charges involve

2     essentially a home invasion at gunpoint.

3          THE COURT:  And that's being pressed forward?

4          MR. MALLARD:  Correct.

5          THE COURT:  I say that not because it's affecting my

6     sentence in any way, but it's such a different charge that I'm

7     not inclined to say I am going to run my sentence concurrent

8     with it.

9          MR. MALLARD:  Okay.

10         THE COURT:  That's the one open issue that appears not

11    to have been pled away one way or another.  It's up to the

12    state court.  If the state court wants to run theirs

13    concurrently, that's a call for the state judge.  That said, it

14    has nothing to do with the charge in this case apparently.  It

15    wasn't like the gun that was used in this case or some such.

16    So I do not make a ruling with respect to the state case one

17    way or another and leave it up to the state court.  Sometimes I

18    say I want it run concurrently.  I'm not saying that because I

19    think it's, frankly, a far more serious charge, and a judge on

20    the state court may well decide to run it consecutively.

21         MR. MALLARD:  Certainly, your Honor.  I think the last

22    point that I'll make with respect to the sentence

23    recommendation and the agreement is that the deterrence message

24    that I think this sentence sends, not only to this defendant,

25    who I'll note has a rather remarkable personal history that's

 1    reflected in the PSR.  I think he has a lot of opportunity to

 2    move forward, and it's unfortunate that this type of

 3    interaction with the criminal justice system is the basis for

 4    him to move on in his life; but I do think counsel's sentiments

 5    in the sentencing memorandum and his personal history reflect

 6    that the significant sentence he's going to receive are perhaps

 7    the impetus towards a correction in his life going forward.  It

 8    also sends a very loud and clear general deterrence message to

 9    those who would possess firearms, especially those facing

10    felony offenses, and violent felony offenses at that.  This

11    sentence was negotiated and imposed within two or three months

12    of the case coming up here, and I think the swiftness of that

13    is something that the Court should also -- that is reflected in

14    the agreement that --

15         THE COURT:  What are the conditions you're recommending

16    for supervised release?

17         MR. MALLARD:  Your Honor, normally in cases like this

18    we look towards potential geographic restrictions, but in this

19    case, I'm not seeking those, and that's largely because the

20    defendant has an extensive support system, which from what I

21    understand is based in Brockton, though that's also, as I would

22    note, perhaps where some of his criminal connections have been

23    historically.  So weighing them against the other, I certainly

24    don't want to put him in a position where he's isolated from

25    his support, even though it runs the risk of placing him in

1    close geographic proximity to those that don't necessarily have

2    his best interests at heart.

3           I would ask the Court to recommend the vocational

4    training that's available in the BOP because I do think he has

5    a large potential to --

6           THE COURT:  What did you say?

7           MR. MALLARD:  The vocational training.

8           THE COURT:  I can't order that.  I mean, I can

9    recommend.  I'll hear from defendant about where he wants to

10   go.

11          MR. MALLARD:  Other than that, your Honor, I don't

12   necessarily have any specific conditions.

13          THE COURT:  Okay, thank you.  I know Probation has

14   recommended some.

15          All right, Ms. Thrall.

16          MS. THRALL:  Thank you, your Honor.

17          THE COURT:  I did read the letters, and I notice there

18   are probably some family members here.

19          MS. THRALL:  Yes, your Honor.  The authors of both of

20   those letters are here.  Ms. Randolph Brown is in the green

21   shirt, and then Alain's parents, Pascale and Raymond Cajuste,

22   are present along with Alain's girlfriend.

23          So I think that Mr. Mallard is correct.  You know,

24   Alain has a really tremendous support system in the Brockton

25   area, and his family has just stuck by him through all of this.

1    And it's really been a lot of interaction with the court system

2    even just within the last year.  Mr. Lenord has really prior to

3    this only been in prison or jail ever for a couple of months,

4    and as Mr. Mallard was describing, it was --

5              THE COURT:  So what happened here?  You know, between

6    this case and very serious charges on the state level, which

7    are so much more serious than what we've got here, what's

8    happened?

9              MS. THRALL:  The state charge is its own animal, your

10   Honor.  The circumstances of that are incredibly complicated.

11   I did write some very specific responses to the way that that

12   charge was characterized in the PSR.  We expect that that case

13   is going to go to trial.  The evidence against Mr. Lenord is

14   very thin on that case.

15             THE COURT:  It's a charge of kidnapping.

16             MS. THRALL:  It's a home invasion and a kidnapping,

17   your Honor.  It's a very serious charge.

18             THE COURT:  It's a very serious charge.

19             MS. THRALL:  A very serious charge.  But Mr. Lenord

20   was actually not charged at all with that for a year.  It

21   happened, and he was indicted under a direct indictment a year

22   later because they thought somebody else did it.  And then at

23   the last moment, a witness at the grand jury changed their mind

24   and said, "No.  Actually, it was Alain Lenord."  The entire

25   situation is --

1           THE COURT:  I'm just simply saying, what happens to

2     him really is not going to be driven so much by this sentence

3     as much as it's going to be driven by if he gets convicted or

4     not in state court because --

5           MS. THRALL:  I agree.

6           THE COURT:  -- if he gets convicted of that, it's

7     likely a long sentence.

8           MS. THRALL:  I agree, and I fully expect that that

9     case is going to trial.  The prosecutor -- I've been working

10    closely with his state court defense lawyer on that case so

11    that some aspects of this could be coordinated.  I'm not asking

12    the Court to impose a concurrent sentence.  That was not part

13    of any agreement.

14          THE COURT:  No, and that's why I'm not.  I sometimes

15    do that on my own.  I do not view that as a violation of a (c)

16    plea where it hasn't been addressed, but this is -- it's like

17    comparing apples and oranges and to the severity of the various

18    issues.  One is highly violent and the other one is illegal.  I

19    mean, it involves a gun.  I mean, let's not -- it's a gun.

20    It's a gun and drugs, which is not exactly a great thing, but

21    it's not the same as a kidnapping.

22          MS. THRALL:  But to get closer to answering your

23    question, your Honor, is that, you know, Alain had, you know --

24    Alain was exposed in Brockton to a lot of people and a lot of

25    influences that were not necessarily positive.  And at one

1    point when he was finishing up high school, his family chose to

2    remove him from Brockton, and he went to live with a family

3    member in Pennsylvania to finish up high school because there

4    were so many issues in that high school, so much violence in

5    that high school, that they needed to remove Alain and get him

6    out of there.  At one point he was not allowed to go back to

7    school, not because of his behavior but because of other

8    violence happening in the school associated with other people

9    who he knew.  So it was a very complicated, dangerous high

10   school scenario, which in a lot of ways is really sad that that

11   is what public high school in Brockton looks like.

12          And, you know, Alain is very young.  This was not that

13   long ago.  This is all in the last, you know, three, four, five

14   years.  So the family made a choice to send him off to finish

15   up high school in Pennsylvania.  He did.  He graduated.  He's

16   very bright.  He went to college.  You know, he has so much

17   potential.  And, you know, we've provided some information from

18   his schools and, you know, the job training that he's had.  He

19   has so many rich opportunities available to him.  But it's also

20   still really hard to completely separate yourself from your

21   friends, even when those friends are not the best influences,

22   and I think that that's a lot of why we're here for this case.

23   I don't want to speak to the open case because I think it's a

24   lot more complicated, but in terms of why we're here and why

25   this charge happened, that's I think my best way of being able

1   to explain it.

2          THE COURT:  So what Probation is recommending, in

3   addition to the mandatory and standard conditions, is substance

4   abuse counseling as directed by the Probation Office, which may

5   include testing not to exceed 104 drug tests per year.  That

6   makes sense, right?

7          MS. THRALL:  We're not opposed to that, your Honor.  I

8   think it's pretty standard for drug testing to --

9          THE COURT:  Right.  So the manualized cognitive

10  behavioral therapy.  Normally I like them to enter in one of

11  these courts afterwards, but that may be hard for him to get to

12  from Brockton.

13         MS. THRALL:  Right, but Restart, your Honor?

14         THE COURT:  Yes.

15         MS. THRALL:  I think that that would be a great option

16  for --

17         THE COURT:  Why don't I recommend Restart, and if for

18  some reason he is unable to get there, he won't go.  But let me

19  ask you this:  Are you suggesting the manualized cognitive

20  behavioral treatment program in addition to or in lieu of

21  Restart?

22         MS. MARCY:  I think that we would screen him for all

23  of our court programs, and if he's an appropriate candidate,

24  the recommendation for Restart doesn't hurt and can be in

25  addition to.

```
 1              THE COURT:  Okay.  And then vocational services
 2    training.  What does he want to be, do you know?  Well, I'll
 3    ask him when he stands up and talks to me.
 4              MS. THRALL:  That's fine, your Honor, yes.  I think he
 5    has a lot of choices, and he's had a lot of exposure to
 6    different careers.  He's done roofing, he's done construction.
 7    He's done some culinary stuff, so I think that he has a lot of
 8    trainings.
 9              THE COURT:  So he may not need the vocational
10    training.
11              MS. THRALL:  He might not.
12              THE COURT:  Well, I'll ask him.  All right, is he
13    going to talk to me?  Is he going to allocute?
14              MS. THRALL:  Yes.
15              THE COURT:  Okay, sir, let me hear from you.
16              THE DEFENDANT:  Good afternoon.
17              THE COURT:  Good afternoon.
18              THE DEFENDANT:  Would you like to hear my letter
19    first?
20              THE COURT:  Yes.  Well, yes, you can read it if you
21    want, or you can just talk to me.  You know what I suggest you
22    start with?  And maybe you were going to do this anyway, but
23    usually, or many times, a defendant comes here all by himself
24    without a single person in the room to support him, and I think
25    one of the most wonderful things that you have going for you is
```

1    not just the letters but the fact that you've got a community

2    out there.  So why don't you introduce them to me.  Who's here?

3              THE DEFENDANT:  That's my dad.

4              THE COURT:  Okay.

5              THE DEFENDANT:  And that's my mother, Pascale.

6              THE COURT:  All right.

7              THE DEFENDANT:  That's my girlfriend, Cassandra.  She

8    gets emotional all the time.  And that's my Aunt Cara.

9              THE COURT:  Okay.

10             THE DEFENDANT:  My dad has been in my life since I was

11   like, I want to say --

12             THE COURT:  All right, you may be seated.  Thank you

13   for coming.

14             THE DEFENDANT:  -- like nine years old, I want to say,

15   nine, ten years old.  My biological father, I had an iffy

16   relationship with him, but --

17             THE COURT:  I read about it.  I'm sorry.  No one

18   should go through that kind of childhood.

19             THE DEFENDANT:  I still love him, but, you know,

20   there's just certain expectations out of me too, but I can't

21   blame him for certain things, you know?

22             My mom has always been by my side, wrong or right,

23   since I was a young kid.  I've always been led in the right

24   path.  I played basketball all my life.  I traveled around the

25   world.  It's crazy to say because she never really had the time

```
1    to even see me play basketball because she was always working,
2    but my stepdad was always there to see me play.
3              THE COURT:  You played Brockton High?
4              THE DEFENDANT:  I played Brockton High.  I played AU.
5    I played with multiple people that's in the NBA now overseas.
6    I played college ball.  I met a lot of people through
7    basketball as far as, like, influences, people that are not
8    good people as well.  I can say that.  But I'm not ashamed of
9    myself that I'm going through this situation I'm going through
10   because I know it's going to make me a better person and I'm
11   going to be more wiser, be a better role model to my brother
12   and sister.  I've got two brothers and sisters.  Well, I've got
13   a brother and a sister.  They're twins.
14             THE COURT:  They're twins, right?
15             THE DEFENDANT:  Yes.
16             THE COURT:  Well, let's put it this way:  You've got
17   this loving family.  You've got twin siblings.  You've got
18   people who are here for you.  So how are we going to make
19   sure -- you have horrible charges pending against you in the
20   state and these serious charges here, so once we're past all of
21   that, what is going to help you lead a lawful and happy life?
22             THE DEFENDANT:  Focusing on myself and my family more
23   than anything, I'd say that; putting a lot of things behind me.
24             THE COURT:  I get that, and I hope that that's the
25   case.
```

1          THE DEFENDANT:  You're saying how am I going to do it?

2          THE COURT:  Yes, how are you going to do it?  So what

3     kinds of jobs do you want?  What do you want to do with your

4     life?

5          THE DEFENDANT:  I want to own my own business.

6          THE COURT:  What kind?

7          THE DEFENDANT:  It's kind of complicated.

8          THE COURT:  I've got time.  What do you want to do?

9          THE DEFENDANT:  Uhm, there's a lot of things I want to

10    do.  I want to -- I had in mind of opening my own landscaping

11    business.

12         THE COURT:  You like flowers and plants and shrubs?

13         THE DEFENDANT:  Yeah, I like it outside.

14         THE COURT:  You like being outside?

15         THE DEFENDANT:  I do.

16         THE COURT:  All right.

17         THE DEFENDANT:  I'm a hands-on person.  I learn very

18    quickly.  I did roofing for about a year or two.  I fell off a

19    roof.  I'm scared of heights anyway, so it kind of evened out.

20    But I love cooking.  I don't cook all the time, but --

21         THE COURT:  Do you want to do cooking for a living or

22    just for eating?

23         THE DEFENDANT:  I mean, I got my ServSafe certificate,

24    and I could have been a cook, a chef on a cruise, but I didn't

25    come out the best cook, I guess, so --

1          THE COURT:  Well, I'm going to recommend vocational

2     training, but it's useful for me to know what area you would

3     want to be in because you need to earn a living lawfully.

4          THE DEFENDANT:  Yes.

5          THE COURT:  And hopefully at some point have a family,

6     live a happy life.

7          THE DEFENDANT:  Exactly.

8          THE COURT:  There's bad parts of Brockton, but it also

9     can be a beautiful city.  So you don't even have to stay in

10    Brockton.  You could go back to Pennsylvania.  You can do

11    whatever you want if you're lawful.

12          So this is what I want you to be thinking about.  I

13    don't know what will happen with the state case.  That's

14    critical to your future, and that's something that I can't

15    control.  I will impose the agreed-upon sentence, but I have to

16    tell you, the Probation Department had some valid concerns

17    about whether it should have been higher or not, partly because

18    the gun was in the car at the same time that you were selling

19    drugs.  So was there a nexus or not?  I don't know.  We could

20    have had a two-day-long hearing, but I'm not inclined to do

21    that.  But what I am inclined to say is, you're in a transition

22    point in your life, an absolute transition point where you can

23    actually go off a cliff and spend a lot of the rest of your

24    life in jail or prison, which is horrible.

25          THE DEFENDANT:  Uh-huh.

1          THE COURT:  Or you can take advantage of it, and with

2     this wonderful family backing you up, you can do vocational

3     training.  You never did get your college degree, did you?

4          THE DEFENDANT:  No.

5          THE COURT:  And maybe at some point get your college

6     degree, and get a job landscaping sounds lovely actually,

7     although it is seasonal.  You may need two kinds of jobs, do

8     the landscaping and then something else during the winter,

9     because right now in Massachusetts, anyone who wants to work

10    can work.  We have the lowest unemployment I think in history,

11    in my memory.  Anyone who wants to work lawfully can work at

12    this point, and you need to put yourself in a position --

13    hopefully it will be this way when you get out -- to be able to

14    work, to have a family, to support the woman you care for, you

15    love, and just put this behind you.

16         So I am going to adopt the sentence.  I am not taking

17    a position as to whether it should be concurrent or not

18    concurrent.  I leave that up to the state court judge.  I am

19    going to accept all the mandatory and standard conditions that

20    are basic things, like not possess controlled substances, not

21    commit crimes, not have a gun.  I'm also picking up substance

22    abuse counseling, drug testing, manual cognitive behavioral

23    therapy, if appropriate, one of the either drug or Restart

24    courts, and I think vocational services training.  I think that

25    that will be important for you when you get out.

1         And last but not least, where should -- I don't

2    know -- I assume -- what happens now?  Is he in state custody?

3         MS. THRALL:  No, your Honor.  Originally when

4    Mr. Lenord was charged, his bail was a personal recognizance.

5    So there's actually -- the state court is not holding him right

6    now.  A bail was later set that was posted, I think a $500

7    bail.  So the state court is not holding him.  He is going to

8    be transferred to a federal facility after the judgment issues

9    and he gets designated.

10        THE COURT:  Well, I'll recommend a facility as close

11   as possible to New England.  I have several of these that look

12   like this.  I forget.  He has a drug problem?  Should I

13   recommend RDAP?

14        MS. THRALL:  I think we did screen for RDAP, your

15   Honor.

16        THE COURT:  I forget.  I should have looked at that.

17        MS. MARCY:  I think it's not enough time, your Honor.

18        THE COURT:  For 37 months?  Yes, he would.  He might.

19        MS. MARCY:  He's served some already.

20        THE COURT:  Oh, he's already served a year or

21   something?

22        MS. MARCY:  I think it's been a year, but, I mean, it

23   doesn't hurt to recommend it.

24        THE COURT:  I'll recommend RDAP, but mostly, if he's

25   not qualified, just to a facility close to New England, close

1    to your family --

2            MS. THRALL:  Yes.

3            THE COURT:  -- potentially.  I don't know if he'd be

4    medium or low security at this point.

5            MS. THRALL:  With an open case, your Honor, I think he

6    might be medium.

7            THE COURT:  Okay, so FCI Berlin is one possibility.

8    At least it's in New Hampshire.  It's a long drive, believe me,

9    even though it's in New Hampshire, but at least it's better

10   than someplace where you can't drive to, and I'll recommend

11   that.

12           MS. THRALL:  Thank you.

13           THE COURT:  The other thing they have, which I urge

14   you to perhaps take care of it, Berlin, the Probation

15   Department has a program where you can towards the end of your

16   sentence get jobs in the city, and you're sponsored by the

17   Mayor.  They have a pipeline program.  But I don't want you to

18   be the bottom-line menial job, right?  You went to college, you

19   know?  I want you to, you know -- I don't know if these

20   institutions allow you to do online college courses, but at the

21   very least, you should be getting vocational training.  And if

22   it's cooking, it's cooking.  If it's landscaping, it's

23   landscaping.  Both of those are pretty, I hate to say it, sort

24   of sometimes don't pay very much, but it's some way to earn

25   your living, or at least be a starter for you when you get out.

1           So I accept this.  It's a three-year term of

2    supervised release.  And I hope that you find your way back to

3    the standards that this wonderful family sponsored you for.

4           So anything else I need to deal with?

5           THE DEFENDANT:  Thank you.

6           MR. MALLARD:  No, your Honor.

7           MS. THRALL:  No.  Thank you.

8           THE COURT:  37, yes.  I'm sorry.  It's a binding plea.

9    I accept the plea.

10           THE CLERK:  I just need to read the notice of appeal.

11    The Court hereby notifies you of your right to appeal this

12    sentence.  If you cannot afford the cost of an appeal, you may

13    move to proceed in forma pauperis.  Any appeal from this

14    sentence must be filed with fourteen days of entry of judgment

15    on the docket.

16           Do you understand these rights?

17           THE DEFENDANT:  Yes, ma'am.

18           THE COURT:  All right, thank you.

19           MS. THRALL:  Thank you, your Honor.

20           MR. MALLARD:  There's one last thing, your Honor.  I

21    think there's a forfeiture order that the Court --

22           MS. THRALL:  Oh, on the firearm.

23           MR. MALLARD:  -- needs to identify orally on the

24    record.

25           THE COURT:  All right, is there any opposition to --

1          MS. THRALL:  No.

2          THE COURT:  All right, thank you very much.

3          (Adjourned, 3:08 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )


        I, Lee A. Marzilli, Official Federal Court Reporter,

do hereby certify that the foregoing transcript, Pages 1

through 22 inclusive, was recorded by me stenographically at

the time and place aforesaid in Criminal No. 18-10479-PBS,

United States of America v. Alain Lenord, and thereafter by me

reduced to typewriting and is a true and accurate record of the

proceedings.

        Dated this 31st day of July, 2019.




                    /s/ Lee A. Marzilli
                    _____
                    LEE A. MARZILLI, CRR
                    OFFICIAL COURT REPORTER